### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **DEBRA SULLIVAN,** *individually and on behalf of a class of similarly situated individuals,*<br><br>**Plaintiff,**<br><br>v.<br><br>**COMMONSPIRIT HEALTH,**<br><br>**Defendant**. | Case No. 1:24-cv-02188<br>Honorable Elaine E. Bucklo |

## <u>DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION PURSUANT TO 29 U.S.C § 216(b)</u>

Scott M. Gilbert
POLSINELLI, PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone: (312) 463-6375
sgilbert@polsinelli.com

Denise Drake
POLSINELLI, PC
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone: (816) 360-4357
ddrake@polsinelli.com

D. Jack Blum
POLSINELLI, PC
1401 Eye Street, NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 772-8483
Jack.blum@polsinelli.com

*Counsel for Defendant*

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................... 1

     A.     CommonSpirit's organization and employment of the putative collective. ...........1

     B.     The purported rounding policy is facially neutral...................................................3

     C.     There is no uniform attendance policy, and application of the attendance policies vary widely among, and within, facilities. .................................................4

     D.     There is no "draconian" attendance policy. .........................................................8

     E.     A court recently rejected identical claims that CommonSpirit's rounding policy was unlawful. .............................................................................................9

III.    ARGUMENT AND AUTHORITIES ......................................................... 10

     A.     Legal Standards....................................................................................................10

     B.     CommonSpirit's legacy rounding policy complied with the FLSA. ....................12

            1.     *Plaintiff does not present any evidence of an unlawful rounding policy.* ......................................................................... 12

            2.     *Nurses in the collective are not similarly situated.* .................... 17

     C.     Plaintiff's putative collective and notice plan are overbroad and must be limited. ................................................................................................................20

            1.     *Nurses employed by Dignity Health in California should be excluded from the collective due to pending litigation pursuant to first-to-file rule* 20

            2.     *Plaintiff's notice plan for various methods of distribution is overbroad and unwarranted.* ................................................................. 21

IV.    CONCLUSION.............................................................................................. 23

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Adair v. Wisconsin Bell, Inc.*,
  No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)..........................................13, 16

*Barrett v. NorthShore Univ. Healthsystem*,
  2019 U.S. Dist. LEXIS 157219 (N.D. Ill. Sep. 16, 2019) ......................................................17

*Bigger v. Facebook, Inc.*,
  947 F.3d 1043 (7th Cir. 2020) ...............................................................................................11

*Binissia v. ABM Inds., Inc.*,
  2014 WL 793111 (N.D. Ill. Feb. 26, 2014) ...................................................12, 13, 16, 17, 23

*Briggs v. PNC Fin. Servs. Grp., Inc.*,
  No. 15-CV-10447, 2016 WL 1043429 (N.D. Ill. Mar. 16, 2016)....................................12, 18

*Camilotes v. Resurrection Health Care Corp.*,
  286 F.R.D. 339 (N.D. Ill. 2012)..............................................................................................19

*Clark v. A&L Homecare & Training Ctr., LLC*,
  68 F.4th 1003 (6th Cir. 2023) ...........................................................................................11, 12

*Davella v. Ellis Hosp. Inc.*,
  2023 U.S. Dist. LEXIS 146610, at *2 (N.D.N.Y. Aug. 21, 2023) .........................................17

*DeMarco v. Northwestern Memorial Healthcare*,
  No. 10 C 397, 2011 WL 3510905 (N.D. Ill. Aug. 10, 2011)..................................................12

*Figueroa v. Hertz Corp.*,
  2019 WL 13294658 (M.D. Fla. Aug. 15, 2019) .....................................................................21

*In re Hardy*
  377 F. Supp. 3d at 615 .............................................................................................................13

*Hoffmann–La Roche, Inc. v. Sperling*,
  493 U.S. 165 (1989)............................................................................................................11, 22

*Howard v. Securitas Security Servs. USA Inc., No. 08 C 2746*
  2009 WL 140126, at *5 (N.D. Ill. Jan. 20, 2009) ...................................................................12

*In re Hudgins,*
  2016 WL 7426135, at *6 ..........................................................................................................23

*Lamarr v. Ill. Bell Tel. Co.*,
    2017 U.S. Dist. LEXIS 79241 (N.D. Ill. May 24, 2017) ........................................17

*Laverenz v. Pioneer Metal Finishing, LLC*,
    746 F. Supp. 3d 602 (E.D. Wis. 2024)..............................................................12, 20

*Mendez v. H.J. Heinz Co., L.P.*,
    2012 WL 12888526 (C.D. Cal. Nov. 13, 2012).......................................................13

*Miller v. ThedaCare Inc.*,
    15-C-506, 2018 WL 472818 (E.D. Wis. Jan. 18, 2018) ..........................................19

*In re New Albertsons, Inc.*,
    No. 21-2577, 2021 WL 4028428 (7th Cir. 2021) ....................................................11

*Nicholson v. UTi Worldwide, Inc.*,
    No. 3:09–CV–722–JPG–DGW, 2011 WL 250563 (S.D. Ill. Jan. 26, 2011)..............12, 20, 21

*Richards v. Eli-Lilly*,
    Docket No. 24-574 __F.3d __ (7th Cir. Oct. 7, 2024) ...........................................11

*Rottman v. Old Second Bancorp, Inc.*,
    735 F.Supp.2d 988 (N.D. Ill. 2010) ....................................................11, 19, 22

*Scholz v. United States*,
    18 F.4th 941 (7th Cir. 2021) ...............................................................20

*Slaughter v. Caidan Mgmt. Co., LLC*,
    317 F. Supp. 3d 981 (N.D. Ill. 2018) .......................................................23

*Schmidt v. Ameritech Corp.*,
    115 F.3d 501, 506 (7th Cir. 1997) .........................................................22

*Swales v. KLLM Transp. Servs., LLC*,
    985 F.3d 430 (5th Cir. 2021) .............................................................11, 12

*Sylvester v. Wintrust Fin. Corp.*,
    No. 12 C 01899, 2013 U.S. Dist. LEXIS 140381 (N.D. Ill. Sept. 30, 2013)..........................23

*Terronez et. al v. St. John's Regional Medical Center and Dignity Health*,
    Case 202100551166CUOE (Sup. Ct. Ventura Cty., CA) ......................................21

*Vakili, et al. v. Dignity Health, et al.*,
    Case No. CGC-18-569456 (Cal. Super.) ..........................................10, 14, 15, 18

*Van Bebber v. Dignity Health*, *Morales et. al. v. Dignity Health*,
    Case 1:19-cv-00264-DAD-EPG (E.D. Cal)................................................21

*Walker et. al v. Dignity Health d/b/a Mercy Merced Medical Center*,
Case No. 1:23-cv-00349-BAM (E.D. Cal) ...................................................................21

*Williams v. Molina Healthcare, Inc.*,
    No. 18 C 5522, 2020 WL 13665599 (N.D. Ill. Mar. 27, 2020) ...............................14

*Williams v. State Farm Mut. Auto. Ins. Co.*,
    678 F. Supp. 3d 980 (N.D. Ill. 2023) ...................................................................20

**Statutes**

29 U.S.C. § 216(b) .........................................................................................1, 11, 12

FLSA......................................................................................1, 3, 9, 11, 12, 13, 19, 21

**Other Authorities**

29 C.F.R. § 785.48(b) .....................................................................................13

## I.     INTRODUCTION

In a feeble attempt to convince this Court to conditionally certify a nationwide collective of nurses from 2,200+ facilities and 145 hospitals, Plaintiff's *Motion for Conditional Certification Pursuant to 29 U.S.C. § 216(b) and for Issuance of Court-Authorized Notice* (the "Motion") presents a mere five self-serving and wholly anecdotal accounts of unique situations experienced by opt-in plaintiffs with respect to CommonSpirit Health's ("CommonSpirit") former rounding practices. Plaintiff's arguments fall flat and should be rejected. Not only does Plaintiff fail to identify common policies that violate the Fair Labor Standards Act ("FLSA") and that are uniformly used throughout the thousands of different facilities at issue, Plaintiff also fails to provide any evidence that (1) the purported common rounding policy undercompensated employees on a widespread or systematic basis or (2) Plaintiff's purported collective of nurses are similarly situated. Not all nurses have the same responsibilities, job duties, supervisors, start or end times, or clinical expectations. All of these factors vary from person to person, supervisor to supervisor, department to department, and facility to facility. Moreover, the job title of "nurse" itself is not a job title within CommonSpirit affiliated facilities. Unsurprisingly, the term "nurse" encompasses over 400 different position codes, each of which reflect the various specialties and expectations of those engaged in the nursing profession.

Based on these grave errors, the Court should summarily deny Plaintiff's Motion as is. However, to drive this result home, CommonSpirit provides substantial evidence herein, including detailed employee declarations, sworn testimony, a recent court opinion rejecting Plaintiff's argument in nearly identical circumstances, and statistical analysis of timesheets to demonstrate that conditional certification is unjustified in this case.

## II.     FACTUAL BACKGROUND

**A.     CommonSpirit's organization and employment of the putative collective.**

CommonSpirit is a national health care organization that was formed in 2019 from the combination of Dignity Health ("Dignity") and Catholic Health Initiatives ("CHI"). Pl. Am. Compl. at ¶ 10. Although some integration has taken place, Dignity and CHI brought to CommonSpirit a variety of legacy systems and forms of organization that, to a great degree, remain in place. For example, legacy-Dignity and legacy-CHI facilities use separate payroll and timekeeping systems. *See* Ex. 3, Watson Dep. at 48:19-24[1]. Employees of legacy-Dignity facilities are generally employed under the Dignity entity, while employees of legacy-CHI facilities are employed under numerous facilities and groupings of facilities. *See id*., at ¶ 48:15-24. Certain "unconnected" facilities like Trinity Health in Ohio also exist. For legacy reasons, these "unconnected" facilities are not integrated into the Dignity and CHI systems; they use their own systems and personnel. *Id*. at 47:5-13. Still, other locations such as Good Samaritan Hospital in Cincinnati are operated by or with third parties through joint venture structures. *Id.* at 56:10-23.

Although Plaintiff presents declarations from five employees who work exclusively at hospitals, the *vast majority* of facilities in the CommonSpirit system are not hospitals, but other types of medical facilities, such as urgent care clinics, primary care clinics, medical group clinics, specialty centers, hospice/palliative care centers, home healthcare, research institutes, outpatient surgery centers, sleep centers, birth centers, cancer centers, and diagnostic imaging centers. Ex. 2, Watson Decl. at ¶¶ 7, 12, 15. Plaintiff provides no evidence of the day-to-day work experiences of anyone in the nursing profession in these settings. Additionally, some of the facilities at issue are unionized, while others are not. *Id*. at 12. In some locations, such as Virginia Mason Franciscan

---

[1] CommonSpirit references the current version of the 30(b)(6) deposition transcript of Diana Watson ("Watson") to the extent a current version of the transcript that incorporates the revisions of the errata sheet has not yet been made available to the parties. Once a corrected version is provided, CommonSpirit will solely rely on the revised version.

Health in Washington, rounding policies are bargained for and included in the collective bargaining agreements entered with unions representing nursing employees. *Id*.

Although the putative collective consists of "nurses who worked at CommonSpirit," this vague description does not fit the realities of the employees at issue. First, "nurse" is not a job title held by any individual at any of the eight locations from which employees have opted-in to this litigation (the "Opt-In Locations").[2] At the Opt-In Locations (which constitute less than 1% of the facilities in Plaintiff's putative collective), there are 437 distinct position codes having some connection to nursing, the vast majority of which do not use the standard title "RN." *See id*., at ¶ 6. The "nursing" job titles encompass a wide variety of positions, ranging from Lactation Educator RN, NSP Dialysis Specialist RN, Resources Coordinator RN, and Student Nurse Technician to RN I through RN VIII—all with varying job responsibilities and expectations. *See generally id*. As a prime example, at many facilities, there is an entire patient transfer center staffed by registered nurses who do not interact with patients but rather work in an office setting to ensure transfers between departments and other facilities are managed seamlessly in the facility's computer systems. *See* Ex. 17, Crook Decl. at ¶ 5. Also, CommonSpirit does not **itself** employ any "nurses." Rather, such employees are employed by the separate corporate entities that operate the care facilities, each having different ownership and control arrangements. Ex. 2, Watson Decl. at ¶ 7.

**B. The purported rounding policy is facially neutral.**

Plaintiff's claims in this action challenge a "time rounding" policy formerly used at CommonSpirit-affiliated locations. *See generally* Pl. Am. Compl., Dkt. 19. Indeed, the **only** common policy Plaintiff alleges that is uniformly applicable to all employees across the 2,200+

---

[2] These locations are CHI Health Creighton University Medical Center – Bergan Mercy; Mercy Hospital; St. Mary Medical Center; Mercy Hospital of Devils Lake dba CHI St. Alexius Health Devils Lake; Saint Joseph Hospital; St. Joseph's Hospital and Medical Center; CHI St. Vincent Infirmary; and Mercy Medical Center.

locations is a facially neutral rounding policy. *See id*. The policy rounded employees' actual clock-in or clock-out times ***up or down*** to the nearest quarter-hour (*i.e.*, X:00, X:15, X:30, or X:45). *See* Ex. 2, at ¶ 9. For example, an 8:02 clock-in would be rounded to 8:00 for payroll purposes, with an employee gaining two minutes, while a 7:58 clock-in would be rounded to 8:00, with an employee losing two minutes. *Id*. Although Plaintiff suggests that the rounding policy was based on an employee's shift start or end times, that is not so; rounding operated based on clock-in and clock-out times with the shift schedule being irrelevant to how time was rounded. *Id.* For example, if an employee was scheduled to start an 8:00 shift but clocked in at 7:52, the time would be rounded to 7:45, the closest quarter-hour, not the scheduled start time of 8:00. *Id.*

**C.    There is no uniform attendance policy, and application of the attendance policies vary widely among, and within, facilities.**

Because the rounding policy itself is neutral, Plaintiff attempts to craft an argument by combining the common, lawful rounding policy with divergent attendance policies, as there is no "CommonSpirit attendance policy" applicable to all locations. *See* Ex. 3, Watson Dep. at 17:4-5. Although CommonSpirit has considered implementing a uniform attendance policy, it has been unable to settle on a workable framework that would accommodate the different expectations and policies of the numerous, diverse work environments across many unique facilities. *Id*. at 17:4-5; 47-48:23-3; 39:6-9. Instead, there are separate attendance policies for each facility, or in some cases groupings of facilities. *Id.* at 17:4-5; 48:18-22. Even with the focus limited to the Opt-In Locations, there are material differences in the applicable written attendance policies. For example, within the eight Opt-In Locations alone, there are at least three variations that materially differ:

- CHI St. Vincent –"tardy" defined as "[r]eporting to work eight (8) minutes but less than two hours beyond the assigned starting time." *See* Ex. 4, at p. 1.

- Bakersfield Memorial Hospital – an "occurrence" may be assessed when an employee clocks in after the shift start time. *See id*. at p. 2.

- CHI Saint Joseph Health – "occurrences" may be assessed when employees "clock in or out ***early*** and or ***late*** without prior approval." *See id.* at p. 5.

Beyond these different formal written policies, there are further facility-, department-, and supervisor-level practices and rules regarding tardiness and attendance. For example, during the time when rounding was used at St. Mary Medical Center Long Beach ("St. Mary"), the facility allowed a seven-minute grace period for employees to clock-in after the start of their shift, during which they would <u>not</u> be considered tardy. *See* Ex. 11, Gonzales Decl. at ¶ 7 & Ex. 1 (email noting, immediately post-rounding, "some facilities in our market are keeping the practice of using seven minutes as their grace period for employees to clock in for their shifts."). After rounding ended, individual departments set their own rules in the department leader's discretion, with departments that have a continuous flow of patient admissions (like Emergency or Labor & Delivery) adopting stricter policies, and departments where patients are admitted at pre-determined times pursuant to appointments (like Clinics or Care Coordination) adopting more flexible policies. *Id.* at ¶¶ 9, 10. Similarly, Denise Yantes, a registered nurse who has worked in numerous roles and departments at Mercy Hospital of Devils Lake ("Devils Lake"), testified via declaration that "[t]he different departments at Devils Lake that I have worked in operate very differently when it comes to how strict they are regarding attendance," with no sanction for clocking-in late in her role in the Cardiac Rehab Department, and stricter standards in Surgery. *See* Ex. 20, Yantes Decl. at ¶ 3. Other employees from the Opt-In Locations also submitted declarations demonstrating unique policies and practices:

| Name | Facility and Department | Summary of Testimony |
|---|---|---|
| Alison Walls | Nurse Manager in Cadiovascular Intensive Care Unit at St. Vincent | I only discipline employees for attendance issues when employees would call in without prior notice to miss their shift because there is a shortage of available staff with the skills and experience to work in the CVICU setting. Ex. 15 at ¶¶ 5 – 6. |

| Alengo Crook | Nursing Supervisor of the Patient Transfer Center at St. Vincent | Everyone in my department is an RN. My team performs and coordinates work that is related to internal and external patient transfers. This work is completed mostly on phone and computer systems provided by St. Vincent's. My RNs work twelve-hour shifts. It is more important to me that they work their full twelve hours than if they are a few minutes late. Ex. 17 at ¶¶ 5-7. |
|---|---|---|
| Marilou Flores | RN in Med-Surg Department at St. Mary | If I run a few minutes behind and clock in after my 6:30 am shift start time, my department is very understanding of this. They have never said anything to me about my clock in times. For example, last month, I clocked in at 6:35, 6:32, and 6:31 am for my 6:30 am shift without repercussions. Ex. 18 at ¶ 5. |
| Terra Erikkson | Human Resources Director at Devils Lake | Although the applicable attendance policy says that employees are tardy if they are not ready to work at their shift start time, attendance and tardiness infractions are subject to manager discretion in terms of when to elevate issues. Managers are not required to discipline nurses or other employees for clocking in one (1) minute late. Individual managers have different approaches in addressing attendance issues. Ex. 6 at ¶ 11. |
| Mary Morrow | Nursing Manager of Rehab Services Department at Bergan Mercy | I have discretion under the attendance policy to determine whether to issue an occurrence to an employee who clocks in one (1) minute or more late. Some supervisors are stricter on enforcing this policy, but in my opinion, it is more important that the employee ultimately works their full eight (8) hour shift, rather than whether they were a few minutes late to their shift start time. Ex. 9 at ¶ 9. |

Similarly, when rounding was in use, there was (and still is) no uniform CommonSpirit policy about when employees should clock-in relative to the start of their shift and what they should do before their start time. Such matters are again subject to the discretion of individual departments and supervisors. *See* Ex. 3, Watson Dep. at 18:18-23; 19:4-6; 20:2-6.

Timeclocks are dispersed throughout hospital facilities. Employees are not required to clock in at a specific location. *See* Ex. 2, Watson Decl. at ¶¶ 13, 14. Indeed, CommonSpirit found that the most heavily used timeclocks were those in the cafeteria – even among employees who were not cafeteria workers when it conducted a study of timeclock use. *See id.; see also* Ex. 3,

Watson Dep. at 114:15-21. Obviously, a nurse who clocks in at the cafeteria timeclock is not immediately working upon the clock-in. Yantes submitted a declaration indicating that when she worked in the Med-Surg Department at Long Beach, some employees would clock-in early but spend the time between clocking-in and the shift-start drinking coffee and conversing. Ex. 20, Yantes Decl. at ¶ 7. Other employees at St. Vincent's Infirmary ("St. Vincent's") testified that nurses would clock in using a timeclock at the hospital entrance before starting work at their work location. *See* Ex. 17, Crook Decl. at ¶ 6. Again, declaration testimony at the Opt-In Locations shows wide variations in practices amongst departments and supervisors:

| Name | Facility and Department | Summary of Testimony |
|---|---|---|
| Trevor Wolfe | Charge Nurse of the Cardiovascular Operating Room at Bergan Mercy | When I arrive to work, I clock in right away. Once I am clocked in, I do not have to start working until my shift actually starts at 6:30 AM. Ex. 13 at ¶¶ 8, 9. |
| Carrie Stone | RN in Labor & Delivery at Bergan Mercy | There is no expectation that I begin working immediately once I clock in. I am not required to start working until my shift's start time at 6:30 AM, even if I am clocked in earlier. Ex. 14 at ¶ 5. |
| Amanda Borecky | Nursing Supervisor of Cardiovascular Surgery Department at Bergan Mercy | Each morning at 6:35 AM, we have a start-of-shift huddle. Employees are expected to be clocked in and on-time for the huddle. . . If they clock in before the start of the huddle, some employees choose to get a head-start on the process of handing off patients, while other employees in my department commonly engage in non-work activities like filling their water bottles, chatting with co-workers, or taking their belongings to the locker room and sitting in there until the start of the huddle. Ex. 12 at ¶ 5. |
| Taylor Smaage | RN in Same Day Delivery Department of Mercy Hospital of Devils Lake | In my department, we can clock in as early as we'd like so long as it is not negatively impacting patient workflow. For instance, if we need to open by 6:00, we can get there at 5:30 or 5:45 to open if we choose. I have personally clocked in 5:30 for a shift where I was scheduled to start at 6:00. Ex. 16, at ¶ 5. |
| Lauren Westerdale | Nursing Director for Neonatal and Women's Services at Bergan Mercy | With the exception of employees in the NICU, who are required to do a "scrub" where they wash their hands and their forearms thoroughly before their shift, other employees under my supervision do not have work to perform prior to the shift huddle because they do not have |

| | | patient assignments. During the time when rounding was used, employees who clocked in before the 6:30 shift start time would engage in non-work, personal activities until the huddle – such as, sitting and chatting with their co-workers or using their personal phone, because they did not yet have patient assignments. After NICU employees completed the scrub, which takes about three (3) minutes, they were free until the shift huddle and used the remaining time before 6:30 to engage in personal activities. Ex. 8 at ¶ 11. |
|---|---|---|
| Kate Lebbert | Nursing Manager in the Labor and Delivery Department at Bergan Mercy. | After clocking in, my employees typically go to change into scrubs in the locker room. Many of them stay in the locker room and chat with their coworkers until their shift start time is 6:30. Others go to the room where we do our morning huddle at 6:30 AM and talk with their coworkers until we start the huddle. Ex. 7 at ¶ 7. |

## D.    There is no "draconian" attendance policy.

Plaintiff presents rhetoric about the supposedly "draconian" attendance policy, but only the most conclusory facts supporting this narrative. For one, as noted above, there is no singular attendance "policy" applicable across the Opt-In Locations, much less the other 2,200+ locations at issue. Rather, there are multiple written policies, with additional layers of department and supervisor discretion as individual managers construe and apply those policies to their specific practice situations. *See* Ex. 3, Watson Dep. at 17:4-7, 14-22; 18-23; 19: 4-6; *see also* Ex. 4.

Of the five plaintiffs and opt-ins who submitted declarations outlining the supposedly draconian attendance policy, only one, Dusti Nystrom ("Nystrom"), states she was actually reprimanded, warned, or disciplined for an attendance issue. *See* Pl. Mot., Dkt. 94-3. None of the others even report such actions happening to a coworker. Nystrom's assertion that her employment was terminated after only three instances of tardiness is categorically false. The applicable corrective action documents show that progressive discipline was initiated based on no fewer than 13 late arrivals between October 11, 2023, and April 19, 2024. *See* Ex. 6, Erikkson Decl. at ¶¶ 10, 12; Ex. 16, Smaage Decl. at ¶¶ 8-10. These included instances where Nystrom arrived 67, 40, 39,

56, and 59 minutes after she was supposed to begin work. *See* Ex. 6, Erikkson Decl. at Ex. 1. It is hardly "draconian" that such untimeliness would result in disciplinary action. Indeed, Nystrom is the only declarant adversely affected by an attendance policy, although she actually had a positive or neutral time adjustment from rounding in approximately 53.44% of her shifts. *See* Ex. 1 at ¶ 9.

The remaining claims about the attendance policies are wholly conclusory. For example, opt-in plaintiff Patricia Lance ("Lance") claims she quit her position at St. Vincent because of the "harsh" attendance policy, but she was never disciplined for attendance despite having twelve late clock-ins during her six-month tenure. *See* Ex. 15, Walls Decl. at ¶ 4. Importantly, Lance never complained about the attendance policy, and when she resigned, she indicated it was due to a crisis situation in her family and the need to be with her granddaughter full-time. *Id.* at ¶¶ 7, 8. The remaining declarations *do not recount any instance* in which a declarant was reprimanded or disciplined for tardiness, or in which they witnessed someone else being reprimanded or disciplined. *See* Pl.'s Mot. Cond. Cert., Dkt 94-1 to 94-5. Rather, the self-serving declarations use obfuscatory statements such as what they thought they were "expected" to do or what they personally thought "everyone knew" without stating any underlying factual basis. *See id*.

### E.   A court recently rejected identical claims that CommonSpirit's rounding policy was unlawful.

This is not the first challenge to CommonSpirit's lawful rounding policy. In 2022, Dignity defeated a putative class action in Superior Court of California, County of San Francisco, in which the court conditionally certified a class of all non-exempt employees (other than Registered Nurses) at six hospitals. *See* Ex. 5, *Vakili, et al. v. Dignity Health, et al.*, Case No. CGC-18-569456 (Cal. Super.). These hospitals are all within Plaintiff's putative collective. The Court granted summary judgment to Dignity based on an analysis of 4,131 employees and 2,369,018 shifts over a multiyear period. The Court found it undisputed that the rounding policy ***"does not***

*'systematically undercompensate' employees." See id.* at p. 11. Importantly, the *Vakili* plaintiffs advanced the same legal theory as Plaintiff does here–"because Defendants have a tardiness policy that can lead to discipline if employees clock in late, the policy is not neutral on its face." *Id.*

The court rejected this proposition, noting that "the mere existence of a tardiness (or attendance) policy has no bearing on the ***facial*** neutrality of the rounding policy." *Id.* The court found based on statistical analysis across the large sample that rounding favored or had no impact in 52.4% of shifts, at one of the hospitals rounding favored employees overall, and at the others any time-losses were "statistically meaningless." *Id.* at 13. The court noted that the plaintiffs' "contention that an employer which has a neutral rounding policy and a tardiness/attendance policy must also have a grace period policy to avoid a successful challenge to its rounding policy is unsupported by any authority." *Id.* Here, multiple locations from which Plaintiff seeks to form her putative collective ***do*** have grace periods, further demonstrating that the rounding policy and the attendance policy are administered and enforced independently within supervisor, managerial, and facility discretion. *See, e.g.*, Exs. 5; 7 – 15. The Opt-In Plaintiff from one of the locations with a grace period (St. Mary), Jennifer Highley, notably *gained time* in 343 out of 713 workweeks (48.1%), and was neutral in 107 others (15%), even if every minute on the clock is assumed to be work time. *See* Ex. 1 at ¶ 10.

### III. ARGUMENT & AUTHORITIES

#### A. Legal Standards

Section 16(b) of the FLSA allows for a collective action "against any employer ... by any one or more employees for and on behalf of himself or themselves and other employees **similarly situated.**" 29 U.S.C. § 216(b) (emphasis added). "Neither the FLSA nor the Seventh Circuit has set forth criteria for determining whether employees are 'similarly situated'" such that notice is appropriate, but most courts follow the *Lusardi* two-step inquiry. *Rottman v. Old Second Bancorp,*

*Inc.*, 735 F.Supp.2d 988, 990 (N.D. Ill. 2010); *see also In re New Albertsons, Inc.*, No. 21-2577, 2021 WL 4028428, at \*2 (7th Cir. 2021). Importantly, the *Lusardi* two-step process is currently under review by the Seventh Circuit. *Richards v. Eli-Lilly*, Docket No. 24-574 __F.3d __ (7th Cir. Oct. 7, 2024).[3] Notably, the Seventh Circuit accepted the pending appeal on an interlocutory basis, finding the employer's argument against the *Lusardi* standard to merit extraordinary review.[4]

Should the Seventh Circuit abandon the *Lusardi* test, consistent with the Fifth and Sixth Circuits,[5] this Court would be required to apply a much more stringent analysis to determine whether Plaintiff has indeed identified a "similarly situated" class of employees. Other courts in the Seventh Circuit have already adopted this more stringent conditional certification analysis that occurs in one step. *See, e.g., Laverenz v. Pioneer Metal Finishing, LLC*, 746 F. Supp. 3d 602, 610–13 (E.D. Wis. 2024) (noting that *Lusardi*'s lenient standard "is in direct contravention of FLSA's text which authorizes notice only to those who are 'similarly situated' to the named plaintiff" and instead applying a more stringent similarly situated analysis before notice is issued to a collective under Section 16(b)) (internal citations omitted).[6]

At the first step of the *Lusardi* analysis, the court looks for a showing that employees are similarly situated. *Howard v. Securitas Security Servs., USA Inc., No. 08 C 2746*, 2009 WL 140126, at \*5 (N.D. Ill. Jan. 20, 2009); *see also Nicholson v. UTi Worldwide, Inc.*, No. 3:09–CV–

---

[3] Oral argument in *Richards* was conducted in January 2025. Should the Seventh Circuit change the applicable standard, CommonSpirit will respectfully request to modify its response to Plaintiff's Motion.

[4] In addition to its lack of textual support, the lenient *Lusardi* method creates perverse incentives for abusive litigation. *Swales*, 985 F.3d at 435; *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1049 (7th Cir. 2020). The *Lusardi* method both (1) fails to ensure that plaintiffs' claims are capable of "efficient resolution in one proceeding," *Hoffmann-La Roche*, 493 U.S. at 170, and (2) creates an "opportunity for abuse of the collective-action device" because "plaintiffs may wield the collective-action format for settlement leverage," *Bigger*, 947 F.3d at 1049.

[5] *See, e.g., Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1009 (6th Cir. 2023); *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 440 (5th Cir. 2021).

[6] *See Swales*, 985 F.3d at 441 (instructing courts to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of employees is similarly situated."); *see also Clark*, 68 F.4th at 1010 (requiring "strong likelihood" standard to determine whether employees are similarly situated).

722–JPG–DGW, 2011 WL 250563, at *2 (S.D. Ill. Jan. 26, 2011) (describing the burden as a "modest factual showing"). The "modest factual showing cannot be founded solely on allegations of the complaint; some factual support must be provided, such as in the form of affidavits, declarations, deposition testimony, or other documents." *DeMarco v. Northwestern Memorial Healthcare*, No. 10 C 397, 2011 WL 3510905, at *1 (N.D. Ill. Aug. 10, 2011). Certification is not automatic. To proceed as a collective action, plaintiffs must "demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15-CV-10447, 2016 WL 1043429, at *2 (N.D. Ill. Mar. 16, 2016).

## B. CommonSpirit's legacy rounding policy complied with the FLSA.

Even at conditional certification, Plaintiff bears the burden to show the existence of "a common policy or plan ***that violated the law***." *Binissia v. ABM Inds., Inc.*, 2014 WL 793111, at *3 (N.D. Ill. Feb. 26, 2014) (emphasis added). To properly plead a FLSA collective based on a time rounding policy, Plaintiff "must not only allege what the rounding policy is, but also additional facts that would plausibly suggest that the policy results in a systematic underpayment of wages." *Hardy*, 377 F. Supp. 3d at 615 (quoting *Mendez v. H.J. Heinz Co., L.P.*, 2012 WL 12888526, *3 (C.D. Cal. Nov. 13, 2012)). Plaintiff has failed to provide any facts suggesting that CommonSpirit's policies resulted in systemic underpayment of wages.

### 1. ***Plaintiff does not present any evidence of an unlawful rounding policy.***

The only "common" policy Plaintiff has alleged is that CommonSpirit previously employed a neutral rounding policy, *i.e.*, one that rounded time both up and down to the nearest quarter hour. Such a policy is lawful under Department of Labor regulations. *See* 29 C.F.R. § 785.48(b). Because rounding is not *per se* impermissible, this Court requires plaintiffs seeking to

conditionally certify a rounding collective to show not only the existence of a common policy or plan, "but also that such policy or plan violated the law." *Binissia*, 2014 WL 793111, at *4 (internal quotation omitted). As such, "the court must make at least some preliminary inquiry into whether the policy or plan complied with FLSA regulations." *Id.*; *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *12 (E.D. Wis. Sept. 11, 2008) (employer's neutral rounding policy "does not automatically permit any of its employees to bring a collective action").

Although Plaintiff received years of timekeeping and payroll data for all non-exempt employees at the Opt-In Locations during discovery, Plaintiff presents ***no analysis or evidence*** about how the rounding policy adversely affected any employee's payroll – much less how it operated on a systematic basis over time. Given Plaintiff's burden to show the rounding policy systematically undercompensates employees over time, Plaintiff's failure to present evidence of how the rounding policy impacts anyone, despite having the data in hand, is the proverbial dog that did not bark. *Williams v. Molina Healthcare, Inc.*, No. 18 C 5522, 2020 WL 13665599, at *4 (N.D. Ill. Mar. 27, 2020) (denying conditional certification based on rounding theory where "plaintiff has put forth no evidence as to how the rounding policy affected other employees, namely MSRs, over time").

The same rounding policy was recently found lawful in *Vakili* based on the same arguments advanced by Plaintiff. *See* pp. 10 – 11, *supra*; Ex. 5. The *Vakili* court found no genuine dispute that these policies ***"do[] not 'systematically undercompensate' employees."*** *Id.* (emphasis added). The 4,131 employees and 2,369,018 shifts analyzed were governed by policies that Plaintiff claims operate in the same manner for all putative collective members, yet 52.4% of shifts were rounded positively or not affected by rounding. *See id*. Plaintiff cannot surmount this Catch-22. On one hand, if the combination of CommonSpirit's rounding policy and diverse attendance policies

13

operate in the same way nationwide, Plaintiff presents no explanation why a different result than *Vakili* would occur here. On the other hand, if there are material differences that would lead to different effects in the *Vakili* facilities than others, then the collective is not similarly situated nationwide and cannot be certified.

Plaintiff seemingly attempts to evade the *Vakili* decision by modifying the collective alleged in the First Amended Complaint of "all current and former non-exempt . . . employees," to now only encompass an undefined group of "nurses." *Compare generally* Pl. First Am. Compl. *to* Pl.'s Mot. for Cond. Cert. Notably, Plaintiff did not amend her pleading to provide notice of this new collective or explain why she abandoned the non-nurse Opt-in plaintiffs.[7] Moreover, the *Vakili* employees were subject to the same allegedly "draconian" attendance policies as the putative collective, and yet rounding in that case was found undisputably lawful. Plaintiff offers no evidence to distinguish the putative collective from the *Vakili* class and presents no basis that rounding operated differently in this case.

The entirely anecdotal evidence Plaintiff presents does not establish even a modest factual basis to conclude that the rounding policy systematically undercompensated employees. Plaintiff focuses entirely on that so-called "draconian" attendance policies, but the strictest of those policies simply require employees to be ready to work when their shift starts (with others providing post-start grace periods). *Compare* Ex. 4 *with* Exs. 6 – 20. If, for example, an employee's shift started at 8:00, the employee could clock in at 8:00 and be unaffected by rounding and compliant with any attendance policy. So, Plaintiff and the declarants assert that they routinely clocked in a few minutes before their shifts began. But only one declarant, Nystrom, alleges she was actually told or required to clock-in before her start time. *See* Pl. Mot., Dkt. 94-3. Despite this supposed

---

[7] With Plaintiff's new collective definition, she has abandoned Opt-Ins Coutney Lekanudos (Office Assistant at Trinity Health System) and Angela Maese (Medical Assistant at St .Joseph's Hospital and Medical Center).

requirement, Nystrom herself was positively or neutrally affected by rounding 53% the time – so her experience does not provide a basis to conclude that the rounding policy was unlawful. *See* Ex. 1. The other declarants testify they "made sure" to clock in early as a precautionary measure, and do not claim they were required to clock in at any specific time before their shift started. In sum, Plaintiff's paltry evidence does not support conditional certification because it is not based on any CommonSpirit or employer "policy" at all, much less a common one.

Plaintiff's argument based on early clock-ins further ignores the effect of clock-out times. If an employee who is scheduled to end work at 7:00 actually clocks out at 7:08, their time would be rounded **up** to 7:15, **gaining** seven minutes to offset any loss from clocking-in early. Plaintiff and the declarants aver that their positions involve serious medical emergencies, and they cannot end their shift if an emergency is ongoing. *See, e.g.*, ECF No. 94-4 ("I sometimes had to stay late because I could not leave if a patient was in crisis or having a medical emergency"). Medical crises, however, do not always end exactly at the seven-minute mark. Any time an employee stays more than seven minutes after their shift ends, there is the potential for positive rounding. This occurred frequently. For example, Plaintiff herself clocked out more than seven minutes after her shift ended on at least 53 of the 100 total shifts she worked. *See* Ex. 21. Similarly, Lance clocked out more than seven minutes after her shift ended on 34 of the 81 total shifts she worked. *See* Ex. 15.

Plaintiff's deficient showing is therefore similar to the *Adair* case where the court found the employees had not met their burden at conditional certification to show the employer's rounding policy was unlawful. There, the employees asserted that rounding favored the employer because employees had to answer phone calls coming in at the end of their shift that extended past the shift end time. *Adair*, 2008 WL 4224360, at *11. However, the *Adair* court noted that such calls could well extend eight or more minutes past the shift end, pushing rounding into positive

15

territory. *Id.* Without actual analysis of the aggregate effect of post-shift work (which Plaintiff also fails to present), the court found that plaintiff's anecdotal evidence was "unconvincing" to show "systematic under-reporting of overtime actually worked" on a "widespread basis." *Id.* That is exactly the same scenario presented in this case.

These facts make this case a far cry from the *Binissia* decision on which Plaintiff heavily relies. There, the rounding policy in the employer's software system was not neutral, because it rounded <u>forward 15 minutes</u> if the employee was early and **only** rounded <u>back five minutes</u> if the employee was late. *Binissia*, 2014 WL 793111, at *2. In this case, the upward and downward rounding is identical. *See* Ex. 2, at ¶ 9. Other employees in *Binissia* used paper punch cards, and supervisors stated they were trained by the payroll department to enter the employee's scheduled times into the payroll spreadsheet regardless of when the employee actually worked. *Binissia*, 2014 WL 793111, at *2. Beyond these policies, the plaintiffs also presented, among their 94 declarations, statements from supervisors that they were trained to instruct employees to arrive early before their shift start time to begin work. *Id.* Again, that is not the case in this matter, making it easily distinguishable.

Other cases cited by Plaintiff also involved alleged requirements that would make a rounding policy **non**-neutral. In *Barrett v. NorthShore Univ. Healthsystem*, the employer allegedly required preparatory work taking 8-24 minutes to be completed before the scheduled shift start time, but did not allow employees to clock in until seven minutes before their start time. 2019 U.S. Dist. LEXIS 157219 (N.D. Ill. Sep. 16, 2019). Here, no declarant asserts they were instructed to begin work at any specific time prior to their shift start or provides any detail about any required pre-shift activities (which would inevitably vary among different types of nurses in different departments). Similarly, in *Lamarr v. Ill. Bell Tel. Co.*, the plaintiffs alleged that they were required

to perform pre-shift (and pre-clock-in) work to start-up equipment and software. 2017 U.S. Dist. LEXIS 79241 (N.D. Ill. May 24, 2017). In *Davella v. Ellis Hosp. Inc.*, employees were required to clock out "within a few minutes" of their shift's scheduled end, even when they were required to continue caring for patients under the hospital's ethics policies. Such post-clock-out work had no potential for payment or positive rounding. No. 1:20-CV-726 (MAD/ATB), 2023 U.S. Dist. LEXIS 146610, at *2 (N.D.N.Y. Aug. 21, 2023). By contrast here, while Plaintiff and the declarants allege they had to work beyond their shift times, they do **not** claim they were required to clock out prior to completing such work. Unlike *Davella*, post-shift end work would be an opportunity for "nurses" to ***gain*** time, not lose it.

Plaintiff does not make the required showing that the rounding policy operated unlawfully, particularly when considered in conjunction with the findings in the *Vakili* case. Plaintiff provides no analysis of how the rounding policy affected any employee, much less on a widespread or systematic basis over time. Instead, Plaintiff merely claims employees chose to clock-in at undefined "early" times to avoid being late, without making any attempt to balance the effect of these early clock-ins against other timekeeping transactions offering the opportunity for time gains. Even still, Plaintiff's five declarants do not show systematic negative effects where nearly one-half had neutral or positive results. *See* Ex. 1.

2.   ***Nurses in the collective are not similarly situated.***

Plaintiff's collective definition of "all nurses" across 2,200+ facilities is the antithesis of defining a cohesive collective of those who are similarly situated. Here, that would require that the putative collective be subject to the same unlawful policy which had the same negative effect of undercompensating the "nurses" in the collective. *Briggs*, 2016 WL 1043429, at *2; *see also Howard*, 2009 WL 140126, at *2. That is not present here for a variety of reasons.

*First*, nurses in the putative collective span approximately 437 distinct position codes and are not employees at the same type of facilities. Plaintiffs were employed at a mere eight hospitals of the 2,200+ facilities at issue (which includes approximately 145 different hospitals). The Motion presents no analysis of the working conditions at the various other types of facilities, or how they compare to those at a hospital. That lack of analysis should be fatal, as there are distinct differences in expectations, even within hospitals, such as between positions in the labor and delivery department and non-patient-facing positions like those in patient transfer centers. *Compare, e.g.,* Exs. 7, 14 *to* Ex. 17. Across the number of facilities at issue, there are innumerable combinations of workflows and positions. Indeed, CommonSpirit's declarations describe the application of different attendance policies in departments where patients arrive continuously – requiring stricter standards so the previous shift can be relieved without disruption – versus those where patients have scheduled appointments – allowing for more flexibility. *See* pp. 5-8, *supra*. Even when addressing much more limited groups of employees, courts recognize that nurses working in different care settings are **not** similarly situated for purposes of FLSA claims based on their workflow and activities. *See, e.g.*, *Miller v. ThedaCare Inc.*, 15-C-506, 2018 WL 472818, at *9 (E.D. Wis. Jan. 18, 2018)* ("Some departments, by the nature of the care provided, were more susceptible to the kind of sudden emergencies that required immediate attention from those responsible for patient care" and "different supervisors within those departments, and over time, utilized different staffing models"); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 351 (N.D. Ill. 2012)* (noting "significant factual differences among the departments" at eight hospitals).

*Second*, Plaintiff relies upon the enforcement of a supposedly uniform attendance policy to demonstrate that nurses were treated similarly. *See* Pl. Am. Compl. at ¶ 57. However, there is no

uniform attendance policy across CommonSpirit or the 2,200+ facilities (or 145 hospitals) at issue. *See* Ex. 3, Watson Dep. at 17:4-5. Attendance at different facilities is governed by differing written policies. For example, some facilities assess tardiness as a single minute late, while others, such as St. Vincent, allow employees to clock-in up to seven minutes late. *See, e.g.* Exs. 4, 15, 17. Beyond the written policy language is the application of informal rules and practices, such as St. Mary's utilization of the seven-minute post-start grace period even though it was not provided in the written policy. *Id*. Notably, opt-in Highley at St. Mary significantly **benefitted** from the rounding policy. *See* Ex. 1. In contrast, at St. Joseph's, the policy prohibited employees from clocking-in before their shift began, eliminating the way that some opt-ins say rounding negatively affected them. *See* Ex. 4. Moreover, attendance expectations vary amongst supervisors and departments, as CommonSpirit has presented substantial testimony from employees at "one minute late" facilities confirming that the attendance policy was more flexible in practice. *E.g.*, Ex. 9. Finally, the fact that nursing employees worked in both union and non-union settings also creates material differences – it strains the bounds of plausibility to think that nurses represented by a union are equally subject to discipline for being merely one minute late based on "draconian" attendance expectations as those with no union.

Even if the Court refrains from engaging in a stringent review of similarity at the first stage of the conditional certification analysis, Plaintiff's attempt to justify a nationwide class of roughly 40,000 individuals, all of whom work at different types of facilities, with different responsibilities, different supervisors, and different attendance expectations, does not pass muster. *See Laverenz, 746 F. Supp. 3d at 610–13*. Stated otherwise, five conclusory declarations from RNs who were employed at five different **hospitals** are not predictive enough for this Court to find that 145

hospitals and 2,000+ non-hospital facilities worth of hourly, non-exempt "nurses" are a suitable collective, even under a modest factual showing standard.

**C.**     **Plaintiff's putative collective and notice plan are overbroad and must be limited.**

     1.     *Nurses employed by Dignity Health in California should be excluded from the collective due to pending litigation pursuant to the first-to-file rule.*

Plaintiff fails to recognize that it is pursuing a collective that involves a significant portion of other nurses who are already participating in pending litigation in California that was filed prior to this case. "Federal district courts have inherent power to administer their dockets so as to conserve scarce judicial resources." *Williams v. State Farm Mut. Auto. Ins. Co.*, 678 F. Supp. 3d 980, 995 (N.D. Ill. 2023). "A suit is duplicative if the 'claims, parties, and available relief do not significantly differ between the two actions.'" *Scholz v. United States*, 18 F.4th 941, 951 (7th Cir. 2021). Put another way, the claims, parties, and available relief must "substantially overlap," although duplicative cases need not be identical. *Nicholson*, 2018 WL 3344408, at *5. The first-to-file rule has frequently been applied in the context of FLSA collective actions. *See, e.g.*, *Figueroa v. Hertz Corp.*, 2019 WL 13294658, at *3 (M.D. Fla. Aug. 15, 2019) ("Many courts apply the first-filed rule to FLSA collective actions," and collecting cases nationwide).

There are multiple, prior-filed cases pending in California against Dignity Health that substantially overlap with this action with the same parties, claims and relief. These cases include *Walker et al. v. Dignity Health d/b/a Mercy Merced Medical Center*, Case No. 1:23-cv-00349-BAM (E.D. Cal); *Van Bebber v. Dignity Health*, *Morales et al. v. Dignity Health*, Case 1:19-cv-00264-DAD-EPG (E.D. Cal); and *Terronez et al. v. St. John's Regional Medical Center and Dignity Health,* Case 202100551166CUOE (Sup. Ct. Ventura Cty., CA). Each of these pending cases involve locations and class definitions which overlap with Plaintiff's putative collective. For example, one of the putative classes in *Van Bebber* is plead as:

> **Class 2:**
>
> All California based non-exempt hourly employees of Defendant who worked at least one (1) day at the Mercy Medical Center Merced facility from four (4) years preceding the filing of this Complaint to the date of the class certification order and who were paid pursuant to Defendant's rounding policy and practice. ("Rounding Class").

Mercy Merced Medical Center is one of the 2,200+ facilities in which Plaintiff is seeking a putative collective for rounding practices and where opt-in plaintiff Stillwell worked. Thus, if the instant collective is certified, there is a risk of inconsistent rulings and double recovery, which should not be permitted. *Nicholson*, 2018 WL 3344408, at *5 (collecting cases). The *Terronez* and *Walker* cases seek the same relief for legacy rounding practices against Dignity Health and are also pending.

Notably, the above cases are Rule 23 opt-out class actions, so employees are automatically included unless they affirmatively opt-out. Moreover, the statute of limitations for all putative class members in those cases is tolled, so there is no prejudice to employees from deferring to the prior-filed cases. To avoid a situation where an employee obtains relief in two pending cases, Plaintiff's putative collective should not include any nurses who were subject to rounding and were employed at Dignity Health facilities in California.[8]

2. ***Plaintiff's notice plan for various methods of distribution is overbroad and unwarranted.***

Plaintiff's Notice Plan requests that CommonSpirit be ordered to provide an extensive amount of personal information of its employees (including email addresses and phone numbers) for roughly 40,000 nurses employed at over 2,200+ locations. This alone is unreasonable and would take a significant amount of effort for CommonSpirit to identify and provide, far exceeding

---

[8] Including, but not limited to, Sequoia Hospital, St. Mary's Medical Center, Mercy Hospital of Folsom, Sierra Nevada Memorial Hospital, Mercy Medical Center – Shasta, Mercy Merced Medical Center, Community Hospital of San Bernardino, St. Bernardine Medical Center, Northridge Hospital Medical Center, Glendale Memorial Hospital and Health Center, California Hospital Medical Center, Dignity Health Medical Network – Ventura, or any of the other facilities identified on Dignity Health's website at https://locations.dignityhealth.org/california.

the 60-day deadline requested by Plaintiff. Plaintiff's proposal also unnecessarily invades the privacy interests of the employees. *E.g.*, *Schmidt v. Ameritech Corp.*, 115 F.3d 501, 506 (7th Cir. 1997). While CommonSpirit recognizes that the Court has broad discretion as to the content and form of the notice,[9] such discretion does not mean the Court should defer to Plaintiff's notice form without modification. *E.g.*, *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 993 (N.D. Ill. 2010). Plaintiff's proposed notice form and contact methods require significant changes to ensure they are not misleading or inaccurate.

*First*, the notice form is misleading because it suggests that CommonSpirit had a rounding policy that was uniform and universal, and it does not recognize that the rounding practices have been abandoned. *Compare* Pl.'s Mot., Dkt. 94-21, Ex. 15, at p.2 *to* Def. Orig. Answer, Dkt 58 at ¶ 45. *Second*, Plaintiff's references to "blackballing" are unnecessary. Nurses are educated individuals and do not need explicit language suggesting CommonSpirit would engage in retaliation, especially given the lack of any such allegations in this case. *See id.*, at p. 4. *Third*, the notice form should not instruct recipients to contact Plaintiff's lawyers for questions while simultaneously admonishing them not to contact CommonSpirit's lawyers. *See id.* at p. 5. Employees can make their own decisions on how they obtain information about the case. This language improperly suggests that CommonSpirit's lawyers will act unethically. These points are reasonable objections justifying revision before the notice is approved and distributed. *See Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2013 U.S. Dist. LEXIS 140381, at *20 (N.D. Ill. Sept. 30, 2013).

The contact methods by which Plaintiff seeks to notify eligible "nurses" of this pending collective action are unwarranted. Plaintiff has provided no evidence that her counsel would be

---

[9] *See Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 169–70 (1989).

unable to contact any significant portion of the putative collective with traditional mail notice. Thus, her request for email notice, text notice, and posting the notice at all of CommonSpirit's time clocks are unnecessary and unfairly prejudicial. *E.g.*, *Binissia*, 2014 WL 793111 at \*6 (authorizing mail notice, but rejecting timeclock posting notice and text notice to potential opt-ins because it was unnecessary and overly burdensome); *Hudgins*, 2016 WL 7426135, at \*6 (holding that "absent any evidence that notice via first-class mail and e-mail is ineffective, these additional forms of notice are unnecessary and overly intrusive."); *Slaughter v. Caidan Mgmt. Co., LLC*, 317 F. Supp. 3d 981, 992 (N.D. Ill. 2018) (holding reminder notice is unnecessary unless and until Plaintiff shows it is necessary). As one of many examples, posting notice at all of CommonSpirit's timeclocks across the country would span tens of thousands of timeclocks, as each of the 2,200+ facilities have multiple timeclocks for nurses and other staff to use. Moreover, monitoring the posting of these notices would be overly burdensome without any evidenced reason to require same. Accordingly, this Court should only allow Plaintiff to provide mail notice (in the revised form described above) to the putative collective, to the extent one is conditionally certified.

## IV.  CONCLUSION

Plaintiff's Motion should be denied in its entirety because (1) Plaintiff has not demonstrated that CommonSpirit's former rounding policy was unlawful; (2) evidence submitted by CommonSpirit demonstrates that the rounding policy at issue was neutral in its application and did not lead to the systemic underpayment of nurses employed by its subsidiaries across the putative collective; (3) the "nurses" Plaintiff seeks conditional certification of are not similarly situated; and (4) the putative nationwide collective and proposed notice are vastly overbroad. These reasons are underscored by the fact that Plaintiff did not provide any statistical or systemic evidence to support her Motion (despite having extensive discovery she could have utilized to do so). As a result, the Court should deny Plaintiff's request for conditional certification.

**DEFENDANT'S EXHIBIT LIST**

| Exhibit | Date | Exhibit Description | Location |
|---|---|---|---|
| 1 | 7/18/25 | Declaration of Stephanie Wolters | Chicago, Illinois |
| 2 | 7/30/25 | Declaration of Diana Watson | Cincinnati, Ohio |
| 3 | 5/20/25 | 30(b)(6) Corporate Representative Deposition Transcript of Diana Watson | Cincinnati, Ohio |
| 4 | 12/01/24 | CHI and Dignity Time and Attendance Policies | CHI St. Vincent Infirmary in Little Rock, Arkansas<br><br>Bakersfield Memorial Hospital, in Bakersfield, California.<br><br>CHI Saint Joseph Health in Lexington, Kentucky |
| 5 | 6/23/22 | *Vakili v. Dignity Health* Summary Judgment Opinion | San Franscisco County, California |
| 6 | 7/03/25 | Declaration of Terra Erikkson | Human Resources Director at Mercy Hospital of Devils Lake dba CHI St. Alexius Health Devils Lake in North Dakota ("Devils Lake"). |
| 7 | 1/13/25 | Declaration of Kate Lebbert | Nursing Manager in the Labor and Delivery Department at Bergan Mercy in Omaha, Nebraska |
| 8 | 5/14/25 | Declaration of Lauren Westerdale | Nursing Director for Neonatal and Women's Services at Bergan Mercy in Omaha, Nebraska |
| 9 | 5/19/25 | Declaration of Mary Morrow | Nursing Manager of Rehabilitation Services Department at Bergan Mercy in Omaha, Nebraska |
| 10 | 5/23/25 | Declaration of Sara Ausdemore | Nursing Supervisor of Radiology Department at Bergan Mercy in Omaha, Nebraska |
| 11 | 7/09/25 | Declaration of Irene Gonzales | Human Resources Business Partner at St. Mary Medical Center in Long Beach, California. |
| 12 | 5/19/25 | Declaration of Amanda Borecky | Nursing Supervisor of the Cardiovascular Surgery Department at Bergan Mercy in Omaha, Nebraska |

| 13 | 1/09/25 | Declaration of Trevor Wolfe | Charge Nurse of the Cardiovascular Operating Room at Bergan Mercy in Omaha, Nebraska |
|---|---|---|---|
| 14 | 1/07/25 | Declaration of Carrie Stone | RN in the Labor and Delivery Department at Bergan Mercy in Omaha, Nebraska |
| 15 | 7/03/25 | Declaration of Alison Walls | RN in Cadiovascular Intensive Care Unit at St. Vincent Infirmary in Little Rock, Arkansas. |
| 16 | 7/14/25 | Declaration of Taylor Smaage | RN in Same Day Surgery Department at Devils Lake in North Dakota |
| 17 | 7/28/25 | Declaration of Alengo Crook | Supervisor of the Patient Transfer Center at St. Vincent Infirmary in Little Rock, Arkansas. |
| 18 | 7/29/25 | Declaration of Marilou Flores | Med Surge Department at St. Mary Medical Center in Long Beach, California |
| 19 | 7/18/25 | Declaration of Laurie Hudson | RN in the Critical Care Float Department of St. Joseph Hospital in Lexington, Kentucky |
| 20 | 7/01/25 | Declaration of Denise Yantes | RN in Cardiac Rehabilitation Department at Mercy Hospital of Devils Lake dba CHI St. Alexius Health Devils Lake in North Dakota. |
| 21 | 4/01/24 | Time Records of Debra Sullivan f/k/a Debra Haley | DEF_002460 to DEF_002468 |

Dated: August 1, 2025

Respectfully submitted,

*/s/ Jack Blum*

Scott M. Gilbert
POLSINELLI, PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone: (312) 463-6375
sgilbert@polsinelli.com

Denise Drake
POLSINELLI, PC
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone: (816) 360-4357
ddrake@polsinelli.com

D. Jack Blum
POLSINELLI, PC
1401 Eye Street, NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 772-8483
Jack.blum@polsinelli.com

*Counsel for Defendant CommonSpirit
Health*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2025, a copy of the foregoing was served to all counsel of record through the Court's CM/ECF system.

/s/ *Jack Blum*
D. Jack Blum